UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

Eastern District of Kentucky
FILED

DEC 1 8 2006

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

CIVIL ACTION NO. 04-231-KSF

TRAVIS BLACKWELL, ANDRE HIGGINS,
LYDIA JACKSON, ISMAIL ABDUS-SALAM and
WANDA RAGLIN                                                                    PLAINTIFFS


vs.                                    OPINION AND ORDER


PRODUCT ACTION INTERNATIONAL, INC.                                    DEFENDANT

\* \* \* \* \* \* \* \*

        This matter is before the Court on the Motion of Defendant Product Action International, Inc.

for Summary Judgment ("Motion").  Having been fully briefed, this Motion is ripe for review.  For

the reasons discussed below, it is the opinion of this Court that the Defendant is entitled to

summary judgment on all of Plaintiffs' claims.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

        Plaintiffs, all former employees of Product Action International, Inc. ("Product Action"), filed

this case May 3, 2004 in Scott Circuit Court alleging a racially hostile work environment and racial

discrimination in violation of 42 U.S.C. § 2000(e) and KRS 344.010 et. seq.  Plaintiffs Andre

Higgins ("Higgins") and Isma'il Abdus-Salam ("Salam") further claimed retaliation for reporting racial

discrimination and harassment, and Higgins alleged discrimination against him because of his gout

in violation of the Americans with Disabilities Act.  Plaintiffs Wanda Raglan ("Raglan") and Lydia

Jackson ("Jackson") claimed constructive discharge.

        Product Action removed the case based on diversity jurisdiction.  Plaintiffs' counsel

withdrew in January 2005 and, after repeated extensions to obtain counsel and several orders to

show cause why their claims should not be dismissed, Plaintiffs noticed their intention to proceed

pro se July 15, 2005 [DE #24, 25] and September 21, 2005 [DE # 30,31].

Pursuant to a Scheduling Order entered January 5, 2006 and a subsequent extension, Product Action filed its Motion for Summary Judgment October 13, 2006. Salam, purporting to represent all Plaintiffs, requested another extension to obtain counsel and respond to the Motion. Having already afforded Plaintiffs twenty months to obtain counsel and considering Defendant's objections, this Court denied the motion and ordered Plaintiffs to file responses on or before November 10, 2006. Pro se, unsigned responses were filed by Salam on November 13 [DE #56, 57] and Jackson on November 15 [DE #58]. One page of Jackson's response appears to be a response on behalf of Raglin. No other responses were filed.

Product Action seeks summary judgment on all claims on the grounds that Plaintiffs do not have direct or circumstantial evidence of intentional racial discrimination or retaliation and cannot show that Product Action's nondiscriminatory reasons for its employment decisions were a pretext. Defendant further argues that no Plaintiffs were subject to a hostile work environment and that Jackson and Raglin have produced no evidence to support their claims of constructive discharge. Defendant also argues that Higgins is not disabled and has no proof of disability discrimination.

### A.    Background on Product Action

Plaintiffs did not dispute the following background facts produced by Product Action. Product Action provides quality control services for the automotive industry across the United States and Canada, including the Toyota Motor Manufacturing, Kentucky, Inc. ("TMMK") plant in Georgetown, Kentucky. At various times, Plaintiffs Blackwell, Higgins, Jackson, Salam and Raglin were hired as Product Action inspectors to provide quality control services to the customer, TMMK [DE # 51, pp. 2-3, 8-16]. Their duties included working on the assembly lines to document the number of parts inspected and the condition of the parts to ensure that only quality parts are incorporated into the automobiles being manufactured [*Id.* at 7].

TMMK has two locations where vehicles are made and inspected, Plant 1 and Plant 2, and a third area called Powertrain where engines are made and inspected [*Id.* at 3]. When work was slow in one location, efforts were made to shift employees to busier locations. When there was not

2

enough work, it was customary for supervisors to seek volunteers to go home.  If there were insufficient volunteers, supervisors typically sent inspectors home on a rotating system [*Id.* at 8].

During the time of Plaintiffs' employment, two of the six shift supervisors in the three locations were African-American, specifically Ben Pennie ("Pennie") and Barshunna Burnam ("Burnam").    Additionally, Georgetown's Regional Human Resources Representative, Monica Ruffin ("Ruffin"), was African-American.  Each Plaintiff upon employment was given a copy of the employee handbook and attended an employee orientation during which the policies and procedures, such as attendance, dress code, safety, code of conduct and harassment policy were reviewed [*Id.* at 4].

Product Action has a "no-fault" attendance policy whereby employees are given an "occurrence" for each incident of absence or tardiness, regardless of the reason [*Id.* at 5].  Failure to report for a scheduled shift without providing four hours of notice constitutes six occurrences.  Twelve occurrences within a rolling twelve-month period results in termination [*Id.*].  There is also a code of conduct identifying forms of unacceptable conduct and a warning that infractions "may result in disciplinary action up to and including termination" [*Id.* at 5-6].  A dress code requires employees to wear company issued clothing at all times [*Id.* at 6].  The company harassment policy encourages "prompt reporting of all incidents of discriminatory harassment" and assures employees that making a report will not result in reprisal or retaliation [*Id.*].

## B.    Plaintiffs' Claims and Responses to Summary Judgment Motion

Because these Plaintiffs are proceeding pro se, this Court carefully reviewed their Complaint and excerpts from their depositions and discussed those claims in greater detail than otherwise would be the case.

### 1.    Travis Blackwell

Mr. Blackwell provided no response to Product Action's Motion for Summary Judgment.  Accordingly, the following facts are taken from the Motion, as supported by Blackwell's deposition and exhibits.  Blackwell was hired as an inspector on March 24, 2003, following a referral by Andre

Higgins [DE #51 at 8]. He received a favorable evaluation and a raise after his first year of employment [Blackwell Dep. 109-111]. On August 10, 2004, Blackwell resigned to accept a position with another company for comparable wages and benefits; his resignation letter thanked Product Action for the opportunity of employment and wished the company the best of luck [Urschel Aff. ¶ 22, Exh. C; Blackwell Dep. 193].

In his Complaint, Blackwell claimed he was subjected to racial slurs and comments, and that white employees received more favorable treatment. He said he reported the harassment and discrimination, but it continued [DE #1, Exh. A, ¶¶ 5-7]. In his deposition, Blackwell said that his supervisor, Hobbs, referred to him as "boy" at some time between May and July of 2003, but he never asked Hobbs not to do so [Blackwell Dep. 134, 138, 139].

On another occasion, Blackwell and Hobbs were discussing the Cincinnati Bengals. Blackwell commented he "couldn't believe how big some of these guys were from training and weight lifting," particularly the arms of Corey Dillon, an African American [*Id. at 134*]. Hobbs said they were "long, too, like a gorilla" and laughed. Then Hobbs said, "I bet his knuckles are all scraped up from dragging the ground" [*Id.* at 135]. Blackwell never told Hobbs he was offended by these remarks [*Id.* at 141].

On a third occasion, Blackwell was working with really dirty auto parts with fellow employee Ketterer, who said: "You know, if I keep working with these parts I'll be as black as you." [*Id.* at 134]. Blackwell simply looked at her and asked her to repeat her comment. He never told her that he did not appreciate the comment [*Id.* at 140].

Blackwell and Salam met with Ruffin on May 13, 2003 to discuss discrimination in being sent home, smoking break violations by others, and some racial remarks, including the reference to "boy" [*Id.* 173-175]. A meeting with supervisors was scheduled for May 14, 2003, and Ruffin reported these matters to Eric Funkhouser ("Funkhouser"), the engagement manager responsible for Product Action's work at TMMK, to address the issues at that meeting [*Id.* 176-77]. Although unclear about the timing, Blackwell admitted that after July 2003, Hobbs never called him "boy"

4

again and "a lot of things started changing" [*Id.* at 138]. Blackwell had complained to Ruffin that he and Salam were sent home when work was slow, but white employees were allowed to stay [*Id.* at 128]. He said after September, he was not sent home [*Id.* at 138]. Product Action addressed each of Blackwell's claims in its Motion, but Blackwell filed no response.

          2.    Andre Higgins

Higgins also did not respond to the Motion. The following facts are taken from the Motion, the supporting record and Higgins' deposition. Higgins was hired as an inspector July 11, 2001 and was supervised by Perkins and Burnam. Higgins referred four African-American individuals to the company, and Product Action hired all of them [Higgins Dep. 266-268]. In his first annual evaluation July 2002, Higgins received the following comments: "Employee can be difficult for Supervision [sic] to work with at times." "Employee needs to take direction from Supervision [sic] without arguments" [Higgins Dep. Ex. 7]. Higgins was terminated June 2, 2003 for using "foul and inappropriate language toward a supervisor" [Higgins Dep. Exh. 29]. During his employment, Higgins was disciplined several times for failure to adhere to company policies and procedures [Higgins Dep. Exhs. 8, 9, 10, 25, 26, 28]. On May 30, 2003, he reported to work in an unauthorized shirt and was asked by his supervisor, Burnam, to remove this shirt and wear a Product Action shirt [Funkhouser Aff. ¶ 29]. Higgins complied. *Id.* Later that same day, Higgins was observed wearing an unauthorized hat. Project Coordinator Clagg asked him to remove it, but he refused [*Id.* ¶ 30]. Clagg notified Burnam who asked Higgins three times to remove the hat, but he refused. After refusing supervisor Burnam's requests, Higgins said to her: "Shawna, don't start this shit with me today." [*Id.*]. Higgins was sent to talk with Ruffin, who issued a corrective action notice regarding the unauthorized clothing. Ruffin was not aware of Higgins' language to Burnam at the time [*Id.* ¶ 31; Higgins Dep. Exh. 28]. After Funkhouser learned about the inappropriate language, he terminated Higgins [Funkhouser Aff. ¶ 32; Higgins Dep. Exh. 29].

Higgins appealed his termination to Mark Urschel, Human Resources Manager at the Indianapolis, Indiana, home office [Urschel Aff. ¶ 15]. Higgins admitted using profanity to Burnam,

but said he was just joking [Id. at ¶ 16; Higgins Dep. Exh. 30]. He did not raise any other issues with Urschel regarding his termination [Higgins Dep. 153]. Urschel investigated, found the termination was supported by company policies, and did not reinstate Higgins [Urschel Aff. ¶ 19].

In his Complaint, Higgins said he was subjected to "a racially hostile work environment" and that "white employees were treated better than black employees" [DE #1, Complaint ¶ 12]. To support his hostile work environment claim, he said that Burnam, an African-American, ceased socializing with him after becoming his supervisor, and that three fellow employees made isolated remarks that he considered offensive. He said he reported the racial discrimination and hostile work environment and raised the issues during a meeting with employees that Funkhouser attended.[1] He claimed he was retaliated against for speaking out on these issues at the meeting [Id. ¶ 14]. He further claimed he suffered from gout and asked during his May 30 meeting with Ruffin to move to another position to "accommodate his disability" [Id. ¶ 15]. He alleged Funkhouser fired him in retaliation for his complaints and request to be moved [Id. ¶¶ 15, 17]. As was the case with Plaintiff Blackwell, Product Action addressed each of these allegations in its Motion for Summary Judgment, but Higgins filed no response.

### 3.   Lydia Jackson

Lydia Jackson was hired October 1, 2001 and was supervised by Perkins and then Burnam [DE #51, p. 11; Jackson Dep. 133-34, 167, 185]. In March 2002, she was promoted to a project coordinator position. From November 12, 2002 until May 30, 2003, she received five separate reprimands for not covering or removing a ring, excessive absences, not fulfilling her duties as a project coordinator and tardiness [Jackson Dep. Exhs. 49, 53, 56, 58, and 61]. On July 21, 2003, Jackson called her supervisor to say she found another job and would not report for work [Id. Exh. 63]. Her final evaluation said she did not meet company standards for attendance and leadership. She had 11.5 occurrences [Id.]; the consequence of 12 occurrences is termination [Id. Exh. 61].

---

[1] It appears this was the May 14, 2003 meeting referenced by several Plaintiffs.

6

In her Complaint, Jackson alleged she was constructively discharged, she was subjected to a racially hostile work environment, and white employees received more favorable treatment in terms of time off from work, job assignments, and ability to remain at work when business was slow [DE #1, Complaint ¶¶ 20-24]. Jackson testified, however, that she "quit on her own" [Jackson Dep. (DE #52, Exh. G) pp. 7-8]. Her evidence of a hostile work environment was that Burnam quit walking around with her and eating lunch with her after Burnam became her supervisor [*Id.* 8, 10, 12, 13]; that when Burnam was writing up another employee for tardiness, she mentioned that her dad said she "can't trust black people"[*Id.* 14]; and that some white inspectors would not want to do a posted job and would be replaced with a black employee [*Id.* 20-21]. Jackson never complained to anyone about the first two matters [*Id.* 14, 18-19]. She complained to Burnam about the job assignments, but not to anyone else [*Id.* 20].

Product Action subsequently learned that Jackson falsified her September 21, 2001 employment application when she answered "no" to the question: "Have you ever been convicted of a crime or are there charges pending against you?" [Jackson Dep. (DE #52 Exh. F) Exh. 38]. In her deposition, Jackson acknowledged that her former employer, Providence Bank, charged her with theft in 1998 or 1999, and she admitted in court taking the money [ DE #52, Exh. F, 102, 111]. She served two months in jail in 1999 or 2000 for violating her probation terms [*Id.* 114].

In response to Product Action's motion for summary judgment, Jackson filed an unsigned and unsworn narrative [DE #58]. Pages 2-3 related an occasion when she found inspector "Laura" asleep on the line; woke her up; reported it to Laura's supervisor, "Daniel," who did not take the action Jackson believed he should; reported it to the next shift supervisor, "Donna," who reported it to Eric Funkhouser; met with Funkhouser, Daniel and Scott Ritchie the next day; was upset when they questioned why she did not call Daniel initially; and called a meeting with them the following day to advise Daniel she did not feel he did his job as a supervisor. As part of this discussion, she said: "We as Product Action employees were told not to engage Toyota in our business, so I knew that it wasn't my responsibility to tell Toyota about the flow out; it was the responsibility of Product

7

Action supervisors and managers." On page 4, she said Caucasian inspectors complained about assignments, and Perkins and Burnam replaced them with African-American employees. She further complained that Katie, Cathy and Holly wore unauthorized clothing but "nothing was ever done about that." No information is provided regarding the race of these individuals or whether their behavior was reported to anyone. Jackson also said Cathy cursed every morning and told stories of her sexual behavior with her husband. Burnam asked Jackson to talk to Cathy about her language once but, otherwise, Jackson complained that nothing was done about this.

Regarding the reprimands she received at Plant 2, Jackson disagreed with the action taken. She noted that two Plant 1 employees came to Plant 2 with their wedding rings uncovered. When Jackson complained, Perkins said she had nothing to do with Plant 1 employees. Regarding the reprimand for gossiping, Jackson said there was so much gossiping at Plant 2 that others did not want to work there and denied participating in it. Regarding the termination notice comments on her attendance, Jackson said she had good attendance until she "came to Plant 2 where all the problems and stress started." She also denied not meeting the standard for leadership.

### 4. Ismail Abdus-Salam

Product Action's Motion and supporting documentation provided the following facts regarding Salam. Salam was hired August 30, 2002. In January or February 2003, he moved to Powertrain under Hobbs' supervision [DE #51 p. 12]. Between September 2002 and May 2003, Salam was given occurrences for absences or tardiness on eight occasions [*Id.* at 13]. On May 14, 2003, a "flow-out" was reported on a job performed by Salam. A "flow-out" is when an inspector fails to identify a defective part, but it is discovered later on the line. A flow-out can result in an inspector's immediate termination. When asked to explain the flow-out, Salam reportedly said "what the f—, it was just one car. Eric is making a big deal over nothing." [DE #51, Exh. P ¶37]. The next day, Salam was assigned to Plant 1, but was reported for refusing to do the work and causing a disturbance [*Id.* ¶¶ 39, 40]. Salam was moved to a different position and again refused to perform [*Id.* ¶ 40]. Funkhouser talked with Salam about refusing to do both jobs, told him he was

8

placed on probation pending an investigation, and said he would be escorted from the building [*Id.* ¶ 41]. On the way out of the building, Salam stopped a Toyota employee to talk about the incident. Following an investigation, Funkhouser terminated Salam on May 23, 2003 for his refusal to perform work and for "his inappropriate conduct toward a customer [Toyota]" [*Id.* ¶ 42].

Product Action subsequently learned Salam falsified his application when he responded "no" to the question: "Have you ever been convicted of a crime or are there charges pending against you?" [Salam Dep. Exh. C]. Salam admitted that he pled guilty and served nine months for rape of a fifteen year-old female client when he worked at Owensboro Treatment Center in 1987 [Salam Dep. (DE #52, Exh. I) p. 51]. He understood he should not have been considered for employment with Product Action, but he misrepresented his past because he needed the income [*Id.* at 77].

In his Complaint, Salam alleged white employees were treated better regarding breaks, job placement, discipline, and being sent home when work was slow [Complaint ¶ 28]. Blackwell and he reported this discriminatory treatment to Ruffin in May 2003 [*Id.* ¶ 29]. He attended part of the May 14, 2003 meeting of supervisors to discuss any racial issues at work, and claimed he was fired the next day for speaking up at that meeting [*Id.* ¶ 30].

In response to Defendant's Motion, Salam filed an unsigned and unsworn narrative of comments inserted into portions of the Affidavit of Eric Funkhouser, comments inserted into portions of Product Action's Motion, and certain exhibits [DE #56, 57]. In this narrative, Salam complained of unauthorized smoking breaks by Hobbs and Ketterer, which he reported to Ruffin on May 13, 2003 [DE #56, comment to ¶ 24]. He said Powertrain did not use a non-discriminatory rotation schedule for slow work days as the Plant 2 supervisors did [*Id.* comment to ¶ 28]. Regarding the flow-out on May 14, 2003, Salam said he was not adequately trained to perform the job, and that he told Funkhouser his view was obstructed by a Toyota employee. He complained his explanation "fell upon 'deaf ears'" and that Funkhouser improperly allowed Donna Perkins, a Plant 2 shift supervisor, to comment that the flow out was his fault [*Id.* comment to ¶ 36]. As to the "possible reasons" for an unfavorable attitude toward him, Salam noted that he was making reports

9

of racial discrimination and company policy violations, including the May 13, 2003 meeting with Ruffin and the May 14, 2003 meeting involving Funkhouser [*Id.*]. Salam denied refusing to perform any task or displaying inappropriate conduct toward a customer [*Id.* comments to ¶¶ 40, 42].

In his comments regarding Defendant's Motion, Salam denied the remark to Funkhouser about the flow-out [DE #57 at 2]. In his deposition, Salam admitted saying, "it's just one car, what are we talking about" but denied using any profanity [DE #52, Exh. I, at 159]. He reiterated that he and Blackwell were reporting racial discrimination and company policy violations [DE #57 at 5]. Salam attached irrelevant documents from a decision of the Department of Unemployment Insurance. In his deposition, Salam's evidence of discrimination was that other people got easier work assignments, and he was sent on the stressful or physical jobs [DE #52, Exh. I, at 188]. He claimed Product Action took information from white supervisors to suspend him and would not let him involve two black individuals "to listen in or to see why I was being suspended." [*Id.* at 193]. He claimed his termination was retaliation for the reports to Ruffin regarding improper treatment [*Id.* at 194-95]. He did not mention improper treatment to Funkhouser or Urschel when discussing his termination [*Id.*]. His evidence in support of a claim of retaliation was: "Because in such a short period of time the chain of events that started happening." [*Id.* at 196].

### 5.   Wanda Raglin

Raglin was hired as an inspector on or about October 10, 2002 [DE # 52, Exh. K (Raglin Dep.) at 69]. During the previous three months, she worked at TMMK through a temporary agency and got along well [*Id.* at 78]. When hired by Product Action, Raglin initially worked in Powertrain and was supervised by Gibson [*Id.* at 86, 98]. In her Complaint, Raglin alleged she was constructively discharged on June 4, 2003 [DE #1 ¶ 33]. She claimed a racially hostile work environment through the comments made by supervisors Gibson and Burnam [¶ 34] and that white employees were treated more favorably in that blacks were given harder jobs [¶ 35].

Raglin testified she overheard Gibson make several remarks that offended her. She heard him tell Tim that blacks are kin to monkeys [Raglin Dep. at 101]. Raglin reported this remark to

Joe's supervisor, Shelly, who said she would take care of it [*Id.* at 103-04]. Raglin did not follow

up with Shelly to see what was done [*Id.* at 105]. On another occasion, Raglin overheard Gibson

talking and laughing with Tim about a black man who was dragged behind a truck and killed. She

asked Gibson how he would feel if he were in that situation and then reported the incident to Shelly

[*Id.* at 106-109]. Raglin believes that Shelly talked to Gibson because he "seemed to have an

attitude about her" after that and changed her job from the dock to the line [*Id.* at 111]. The next

day, Raglin called Funkhouser to discuss the comment and the way Gibson was treating her;

Funkhouser told her he would take care of it [*Id.* at 112-14]. She did not follow up to find out what

was done. On one other occasion, Raglin heard Gibson talking about a celebrity with enhanced

lips and asking why anyone would want lips like a black person [*Id.* at 116-17]. She did not tell

anyone about this comment. Raglin later testified that Gibson was fired in December 2002, and

the people who had worked on the dock in Powertrain were separated [*Id.* at 99-100; DE #52, Exh.

L (Raglin Dep. Vol. II) at 10].

After Gibson was fired, Raglin stayed with Jessica on the dock at Powertrain for three to

four weeks and did not feel any racial bias [Exh. L at 11]. Raglin requested a first-shift position,

and Shelly contacted her about an opening shortly thereafter. In January or February of 2003, she

moved to Plant 2 and was supervised by Burnam [*Id.* at 12, 15-16]. Raglin complained that

Burnam used to be nice and have lunch with her, Blackwell and Jackson, but then began saying

she had to leave before others saw them eating lunch together [*Id.* at 37]. Raglin thought Burnam

wanted to be liked by everybody and did not want to appear to be favoring blacks [*Id.* at 77]. On

one occasion, Burnam, Jackson and Raglin were walking to a job site and Burnam began talking

about catching Gary, an African-American, sleeping the day before. Burnam said her father told

her that black people couldn't be trusted. No one said anything to Burnam about this remark, nor

did they complain to human resources or Funkhouser [*Id.* at 49-52]. In the context of a discussion

regarding a Ms. Lynn being favored, Raglin also heard Burnam say that black people cannot do

what white people do. When Raglin told Burnam that this was not fair, Burnam asked if Raglin

would make her mother or grandmother work on the line, to which Raglin responded affirmatively. This incident was not reported to anyone [*Id.* at 57-60]. Raglin concluded that Burnam was not a strong supervisor and would let people run over her when she tried to rotate assignments. Still, Raglin liked Burnam and considered her to be a friend [*Id.* at 78-79]. Raglin said her claim of constructive discharge was based on the fact that Product Action "wasn't a nice place to work" and she "had to deal with all the emotional stress." She also felt "unwelcome." [*Id.* at 86].

Product Action's Motion provided the following additional facts. Raglin referred African-Americans individuals to Product Action December 31, 2002 and February 22, 2003, and they were both hired [DE #51, p. 14]. Raglin accumulated sixteen occurrences relating to attendance between November 26, 2002 and June 4, 2003, the last six of which were for not reporting to work on June 4. She was terminated June 5, 2003, pursuant to the attendance policy [*Id.* 15-16].

In Raglin's unsigned and unsworn response to the Motion, she claimed that she did call in on June 4 and complained that Gibson took smoke breaks any time in violation of policy. She stated black people would be told there was no work in Plant 2, but on occasion a Caucasian would be brought in to work. She said it took at least a week to fire Laura for sleeping, but Gary was fired the same day. Finally, she claimed she had to call in to see if she could work when business was slow, but Caucasians could come in without work to do [DE #58].

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence, all

facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

The following cases shed additional light on the evidence to consider in ruling on a summary judgment motion. In *Davis v. Cotting Carriers*, 102 Fed. Appx. 938 (6th Cir. 2004), the plaintiff was an African-American truck driver alleging racial discrimination and proceeding pro se. The court said:

> Where the nonmoving party fails to respond to the motion for summary judgment, the trial court is under no obligation to search the record to establish an absence of a genuine issue of material fact. *Street v. Branford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). In this posture, the trial court may rely upon the facts presented and designated by the moving party. *Guarini v. Brookfield Township Trs.*, 980 F.2d 399, 404 (6th Cir. 1992).

*Id.* at 939. *See also U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997). Also relevant to the facts of this case is *Little v. BP Exploration & Oil Co.*, 265 F.3d 357 (6th Cir. 2001) in which an African-American claimed retaliation for claims of racial discrimination. In response to a motion for summary judgment, the plaintiff submitted a letter from another former employee. The Sixth Circuit held that the trial court properly disregarded the letter "because it was an unsworn statement." *Id.* at 363, n. 3 (citing *Pollock v. Pollock*, 154 F.3d 601, 611 n. 20 (6th Cir.

1998) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991) ("A court may

not consider unsworn statements when ruling on a motion for summary judgment"). In the present

case, as in *Little*, the unsworn narratives do not qualify for the statutory exception to this rule under

28 U.S.C. § 1746. *See also Cutts v. Steelcase, Inc.*, 2006 WL 1722227, at *6 (W.D. Mich. 2006).

## III.   ANALYSIS

### A.   Racially Hostile Work Environment

Title VII standards are also used to evaluate state race discrimination claims brought under

Kentucky's Civil Rights Act. *Wilson v. Dana Corp.*, 210 F. Supp. 2d 867, 877 (W.D. Ky. 2002). To

establish a prima facie case of hostile work environment based on race, a plaintiff must show: "(1)

that he is a member of a protected class; (2) that he was subjected to unwelcome racial

harassment; (3) that the harassment was based on race; (4) that the harassment had the effect

of unreasonably interfering with this work performance by creating an intimidating, hostile, or

offensive work environment; and (5) the existence of employer liability." *Cutts v. Steelcase, Inc.*,

2006 WL 1722227, at *11 (W.D. Mich. 2006) (citing *Newman v. Federal Exp. Corp.*, 266 F.3d

401,405 (6th Cir. 2001)). *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000), elaborated

on this requirement:

> In order to establish a racially hostile work environment under Title VII, the plaintiff
> must show that the conduct in question was severe or pervasive enough to create
> an environment that a reasonable person would find hostile or abusive and that the
> victim subjectively regarded it as abusive.

In addition to meeting these objective and subjective elements, the "plaintiff must also prove that

his employer 'tolerated or condoned the situation' or knew or should have known of the alleged

conduct and did nothing to correct the situation." *Id.*

To determine whether an environment is sufficiently hostile or abusive, courts should look

"'at all the circumstances' including the 'frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton,*

524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  The conduct "must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 788.  "The harassment should be ongoing, rather than a set of isolated or sporadic incidents." *Cutts*, 2006 WL 1722227 at *11 (citing *Allen v. Mich. Dep't. Of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999)).  Moreover, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (citing *Newman*, 266 F.3d at 405, quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  The standard is such that it should "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Wilson*, 210 F. Supp. 2d at 878 (quoting *Faragher*, 524 U.S. at 788).

When the Plaintiffs' hostile work environment claims are analyzed, it is clear that Product Action is entitled to summary judgment.  All Plaintiffs are members of a protected class, but their claims fail to satisfy the other requirements for a prima facie case of hostile work environment.

       1.     Travis Blackwell

Blackwell said his supervisor, Hobbs, referred to him as "boy" on a number of occasions [Blackwell Dep. 133-34].  Hobbs also commented that the very large arms of a Cincinnati Bengals football player were long, like a gorilla, and must drag the ground [*Id.* at 135].  Viewing these remarks in the light most favorable to Blackwell, they could be viewed as racial in nature, thus satisfying the third prong of a prima facie case.  Blackwell cannot show, however, that these remarks unreasonably interfered with his work performance or that Product Action tolerated or condoned the situation.  Blackwell said he just let the references to "boy" "go in one ear and out the other" [*Id.* at 140].  When he finally decided to bring these matters to the attention of Ruffin on May 13, 2004, she immediately asked Funkhouser to address them at a meeting involving supervisors the next day.  Blackwell said "a lot of things started changing" after that and Hobbs never called him "boy" again [*Id.* at 138].  These incidents were isolated and fall far short of being sufficiently pervasive, hostile or abusive to constitute a hostile work environment.  *Andrews v.*

*Lockheed Martin Energy Systems, Inc.* 2006 WL 2711818 at *8 (E.D. Tenn. 2006) (Supervisor's use of the word "boy" is not sufficiently severe and pervasive to create a hostile work environment); *Johnson v. Box USA Group, Inc.*, 208 F. Supp. 2d 737, 743 (W.D. Ky. 2002). Moreover, as in *Cutts*, when the conduct was brought to the employer's attention, it was promptly corrected, and there were no further problems. *Cutts*, 2006 WL 1722227 at *13. Thus, Blackwell failed to show a racially discriminatory hostile work environment.

Blackwell's reliance on fellow employee Ketterer's comment that she would become as black as he does little to help his claim. There are different standards for employer vicarious liability, depending on whether the alleged harasser is the victim's co-worker or supervisor. *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 348 (6th Cir. 2005). With a harassing co-worker, an employer is liable only "if it knew or should have known of the charged [racial] harassment and failed to implement prompt and appropriate corrective action." *Id.* (quoting *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)). There is no evidence that Blackwell reported this incident before May 13, 2003. Corrective action was taken when the employer became aware of racial comments, and the incidents remained isolated, rather than pervasive.

Finally, Blackwell worked for Product Action a number of months after the alleged remarks. He received a positive evaluation and raise and earned an employee of the month award. Blackwell thanked Product Action for the opportunity in his resignation letter. Thus, the comments about which Blackwell complained did not unreasonably interfere with his work performance.

Blackwell, Higgins, Jackson and Raglin further attempt to support their claims of hostile work environment by broadly alleging that white employees received more favorable treatment, such as less strenuous work or more opportunities to work when business was slow. To the extent these claims are based upon the behavior of Burnam as a supervisor, the record reflects Raglin's belief that Burnam was not a strong person, wanted to be liked by everyone, and would let some employees walk all over her when she tried to rotate assignments. These and other preferential treatment allegations are presented with far too little detail for the Court to evaluate the claims.

Plaintiffs do not deny that the work they were required to do was part of their job duties. Instead, they allege that others were assigned easier jobs. As the court said in *Wilson*: "Plaintiffs' mere assertion of such a conclusion amounts to little more than their own evaluation, judgment or allegation, without any supporting evidence. The case hinging on allegations of disparate treatment cannot go to the jury on mere allegations alone." 210 F.Supp.2d at 879, n. 7.

### 2. Andre Higgins

Higgins complained that Burnam ceased having lunch and talking with African-American employees after she became their supervisor [Higgins Dep. 206-07, 211]. Jackson and Raglin also cited this change in Burnam's behavior in support of their claims. Raglin recognized it as a supervisor's effort to avoid showing favoritism toward blacks [Raglin Dep. 77]. This conduct certainly falls far short of proof of racial harassment.

Higgins also noted that Burnam told a group of employees to split up, that her daddy told her hanging around black people would get her in trouble [Higgins Dep. 204-05]. Jackson and Raglin report a similar comment by Burnam that her dad told her she cannot trust black people [Jackson Dep. 14; Raglin Dep. 51]. No one said anything to Burnam or to anyone else at Product Action about these remarks [Jackson Dep. 14-15, 19; Raglin Dep. 57]. In fact, when Funkhouser asked Higgins if Burnam would make a good supervisor, Higgins said yes [Higgins Dep. 214-15]. These isolated remarks do not reflect an ongoing, pervasive environment that unreasonably interfered with work performance so as to satisfy the requirements of a prima facie case.

Higgins also complained about three separate remarks by fellow employees. First, Jennifer commented, when seeing a group of African-American workers, that "they got all the black people in one spot, you all must have been — you all must stay in trouble a lot." [Higgins Dep. 177]. When Higgins reported the incident to Funkhouser, Jennifer was moved to another location and the comments ended [*Id.* at 180-81]. Second, Mable did not socialize with blacks and told Higgins she had not been around African-Americans [*Id.* at 187-88]. Higgins complained to Burnam, and Mable was moved to another area [*Id.* at193]. Thus, these reported matters were promptly corrected.

17

Third, Katie told Higgins she preferred black men over white men. Higgins thought Katie wanted to be "hooked up" with Howard, an African-American employee [*Id.* at 199-201]. Higgins did not report Katie's comment to anyone [*Id.* 203, 220]. Katie's remark reflects the opposite of racial animus. Thus, this comment does not support Higgins' claim.

### 3.   Lydia Jackson

Lydia Jackson's complaints of a hostile work environment are addressed above as they duplicate the complaints of Higgins regarding Burnam.

### 4.   Wanda Raglin

Raglin's complaints regarding Burnam are discussed above. Basically, Raglin felt Burnam was too nice and let people run over her. Nonetheless, Raglin considered Burnam a friend. Raglin's proffered evidence does not reflect a belief that Burnam acted with discriminatory animus, but rather that she tried to please everyone.

Raglin also complained about three separate remarks made by her supervisor, Gibson, to another employee and overheard by Raglin. The first was a reference to blacks being kin to monkeys [Raglin Dep. at 101]. Raglin reported this remark to Gibson's supervisor, who said she would take care of it. Raglin did not follow up to determine what, if anything, was done. On another occasion, Raglin heard Gibson laughing with an employee about a black person being pulled behind a truck and killed [*Id.* at 105]. She confronted Gibson on this occasion and then reported him to his supervisor. She believed the supervisor talked to Gibson because Gibson "seemed to have an attitude about her" after that and changed her job. She reported this to Funkhouser, who said he would take care of the situation. She did not follow up with Funkhouser. On a third occasion, Gibson remarked to another employee why would anyone want lips like a black person. Raglin did not report this comment to anyone. While Raglin said she did not follow up to see what action was taken in response to her reports, she also testified that Gibson was fired in December 2002, less than three months after she started working under his supervision.

Gibson's three remarks, while totally inappropriate, also were isolated events.  None of them were directed at Raglin, nor were they threatening.  *See Wilson,* 210 F. Supp. 2d at 879.  One of the plaintiffs in *Wilson* believed two co-workers were imitating the same truck dragging news story mentioned by Raglin, but that court granted summary judgment for the employer.  *Id.* at 874, 879.  Raglin does not adequately demonstrate Gibson's conduct was severe and pervasive so as to interfere unreasonably with her work performance.  Once Gibson was fired, Raglin did not feel any racial bias at Powertrain [Raglin Dep. Vol II at 11].  Additionally, Raglin did not present evidence that Product Action tolerated or condoned the harassment.  To the contrary, corrective action appeared to have been taken quickly.  Accordingly, Product Action is entitled to summary judgment on these claims of hostile working environment.

### B.      Race Discrimination

Because Plaintiffs have no direct evidence of discrimination, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.  To establish a prima facie case of race discrimination, a plaintiff bears the initial burden to introduce circumstantial evidence sufficient to raise a genuine issue that his employer discriminated against him.  A plaintiff must prove that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees."  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

Plaintiffs Blackwell and Jackson suffered no adverse employment action.[2]  Accordingly, they cannot meet their burden to establish the second element of a prima facie case of race discrimination.  *See Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999).

Plaintiffs Higgins, Salam and Raglin do not allege that they were replaced by white employees.  Nor do they identify any Caucasian inspectors who were similarly situated and

---

[2] Blackwell and Jackson's claims of constructive discharge are discussed separately below as being without merit.

received more favorable treatment. To be similarly situated in the disciplinary context, the Sixth Circuit has held that "the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Additionally, the court can look at certain factors, such as "whether the individuals 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* Higgins, Salam and Raglin make no attempt to identify any Caucasian person who engaged in similar conduct and was not disciplined in a similar way. Accordingly, none of them can satisfy the fourth prong of a prima facie case.

Even if it could be argued that Plaintiffs Higgins, Salam and Raglin did meet all requirements to establish a prima facie case of race discrimination, Product Action demonstrated non-discriminatory reasons for terminating each employee. Higgins admitted swearing at his African-American supervisor after refusing to comply with her requests to remove an unauthorized hat. Salam admitted being responsible for a flow-out, but blamed his employer for not training him properly and blamed a Toyota employee for getting in his way. He admitted saying, "it's just one car; what are we talking about." He also admitted attempting to involve two black individuals with Toyota "to listen in or to see why I was being suspended." Jackson voluntarily advised this Court regarding her understanding about involving employees of the customer, Toyota, in Product Action matters. She said, "Product Action employees were told not to engage Toyota in our business" and that she should not "tell Toyota about the flow out." Contrary to this directive, Salam tried to involve Toyota employees in his suspension from the flow out, which conduct was a factor in his termination. Raglin was discharged for having sixteen occurrences in less than eight months. Accordingly, Product Action has met its burden of articulation of some "legitimate non-discriminatory reason for the employee's discharge." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (quoting *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329 (6th Cir. 1994)).

The burden then shifted back to Plaintiffs to demonstrate that Product Action's explanation for their terminations was a pretext for discrimination. It is not sufficient merely to dispute the facts which were the basis for the discharge. A plaintiff "must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* at 494 (quoting *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir. 1998)). In determining whether an employer reasonably relied on the facts before it, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

Higgins filed no response to the summary judgment motion and offered no evidence of pretext. Funkhouser terminated Higgins after learning that he cursed Burnam. Higgins appealed to Urschel in the home office, who investigated and determined that the termination was supported by company policies. Higgins did not mention racial discrimination in his appeal to Urschel.

Salam's unsworn response to the Motion cannot be considered. *Cutts v. Steelcase, Inc.*, 2006 WL 1722227 at *6 (W.D. Mich. 2006). Even if it were considered, the result would be the same, as the response merely reflects disagreement with the employer's decisions. Salam did not mention racial discrimination when discussing his termination with Funkhouser or Urschel and has offered no evidence of pretext.

Likewise, Raglin's unsworn response to the Motion cannot be considered. Raglin also did not offer any evidence of pretext.

Based on the record herein, it is the opinion of this Court that Product Action is entitled to summary judgment on Plaintiffs' claims of racial discrimination.

### C. Constructive Discharge

Jackson and Raglin alleged in their Complaint that they were constructively discharged. Raglin was terminated for excessive absences and tardiness, having accumulated sixteen occurrences in less than eight months. She has not alleged any facts that would support a legal basis for a claim of constructive discharge.

Jackson testified in her deposition that she "quit on her own" [Jackson Dep. 7-8]. However, she alleged in her Complaint that she was constructively discharged. In *Logan v. Denny's, Inc..*, 259 F.3d 558, 568-69 (6th Cir. 2001), the court announced:

> To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer ... deliberately created intolerable working conditions, as perceived by a reasonable person and 2) the employer did so with the intention of forcing the employee to quit....

(Internal quotation marks and citations omitted). In evaluating the first prong of that inquiry, a court should consider the following factors, singly or in combination:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 569. Constructive discharge is not a separate cause of action; "there must be an underlying action for employment discrimination." *Wilson v. Dana Corp.*, 210 F. Supp. 2d 867, 888 (W.D. Ky. 2002) (quoting *Starks v. New Par*, 1999 WL 357757, at *5). A plaintiff must prove aggravating factors beyond discrimination in order to establish constructive discharge. *See Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987). As in *Wilson*, Jackson's underlying claim of racial discrimination is without merit, and so, too, is her claim of constructive discharge. Moreover, there is no evidence of her employer engaging in any of the relevant factors or other similar factors. *Compare Saroli v. Automation & Modular Components*, 405 F.3d 446 (6th Cir. 2005) ("Shore's words and actions made clear to Saroli that she ought to consider resigning because if she chose to remain at the company she would 'probably' be demoted"). Product Action is entitled to summary judgment on these claims of constructive discharge.

## D.   Retaliation

Salam and Higgins claim that their terminations were retaliation for their complaints of racial discrimination. They both alleged they were fired for speaking up about racial issues in a May 14,

22

2003 meeting. Salam was suspended on May 15, 2003 and terminated May 23, 2003. Salam's only evidence in support of his claim of retaliation is the short time span between the May 14 meeting and his suspension/termination [Salam Dep. at 196]. Higgins was terminated June 2, 2003.

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in activity protected under Title VII; (2) the exercise of the protected right was known to the employer; (3) the plaintiff suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Wolfe v. Norfolk Southern Railway Co.*, 66 Fed. Appx. 532, 535 (6th Cir. 2003), *Thaddeus-X v. Blatter*, 175 F.3d 378, 386-87 (6th Cir. 1999) (en banc).

Plaintiffs have failed to present sufficient evidence of the fourth prong to establish a prima facie case of retaliation. "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Mr. Nguyen argued the temporal proximity between his filing three EEOC charges in early 1996 and his employer's failure to promote him during the same time frame. The court rejected the argument that this evidence established a prima facie case. "[T]emporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Id.* at 566. "In *Cooper [v. City of North Olmsted*, 795 F.2d 1265 (6th Cir. 1986)], we rejected the proposition that temporal proximity is enough, noting that the plaintiff had pointed to no additional evidence to support a finding that the protected activity and the adverse action were connected." *Id.*

As in *Cooper, Nguyen* and the present case, "the fact of temporal proximity was not particularly compelling, because the plaintiff's retaliation case was otherwise weak, and there was substantial evidence supporting the defendant's version of the events." *Id.* at 567. Higgins and

Salam do not offer any additional evidence whatsoever to connect their protected activity and the adverse action. Instead, the timing of their terminations is directly connected to their serious misconduct as employees. Salam was late arriving at the May 14, 2003 meeting because of the investigation of the flow out he caused that day. The next day he had trouble performing two jobs and then attempted to involve Toyota employees in his suspension as he was being escorted out of the building. Funkhouser completed an investigation of the entire situation before deciding to terminate Salam on May 23. Likewise, Higgins chose on May 30 to refuse three times to remove an unauthorized hat and then curse his supervisor. Higgins admitted cursing Burnam. Funkhouser investigated the situation and terminated Higgins. Neither plaintiff presented any evidence to support an inference that their terminations were in retaliation for protected activity.

### E.   Disability Discrimination

Higgins claimed he suffered from gout and asked Ruffin during their meeting May 30, 2003[3] to move to another position to accommodate his disability [Complaint ¶ 15]. He argues that he was fired because he requested this accommodation. To establish a prima facie case of discrimination under the Americans with Disabilities Act ("ADA"), Higgins must show he is (1) a disabled person within the meaning of the Act; (2) who is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) that he was discharged solely by reason of his handicap. *Macy v. Hopkins County Board of Education*, 429 F. Supp. 2d 888, 897 (W.D. Ky. 2006) (citing *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 810 (6th Cir. 1999) and *Monette v. Electronic Data Systems Corp*, 90 F.3d 1173, 1178 (6th Cir. 1996)). The Act defines a disabled person as one who "(1) has a physical or mental impairment that substantially limits one or more of the major life activities of the individual, (2) has a record of such an impairment, or (3) does not

---

[3] This is the same day Higgins refused to comply with the dress code and cursed Burnam.

have an impairment, but is regarded as having one." 429 F. Supp.2d at 897, n. 4; 42 U.S.C. §
12102(2).

In the present case, Higgins failed to produce any evidence that he suffers from a "disability"
within the meaning of the ADA. As the Supreme Court held in *Toyota Motor Mfg., Kentucky, Inc.
v. Williams*, 534 U.S. 184, 198 (2002), it is insufficient for a plaintiff merely to produce evidence of
a diagnosis, such as carpel tunnel syndrome or gout. Instead, he must show he has a permanent
or long-term impairment that substantially limits one or more major life activities. *Id.*

The evidence here, by contrast, is that  Higgins' gout flared up about three times a year
when it was at its worst, and it went away with medication [DE # 52, Exh. D (Higgins Dep.) at 287-
288]. He acknowledged that certain food makes it flare up [*Id.* at 291]. He said when it flared up,
he "couldn't stand all day on the line or couldn't move fast" [*Id.* at 37]. He would ask his supervisor,
Burnam, for a "sit-down" job that day, but she had already filled those positions with individuals on
light duty for medical problems [*Id.* at 293]. Higgins felt the sit-down positions should have been
rotated [*Id.* at 302]. This evidence falls far short of the ADA requirements in *Toyota*. *See Craig v.
Continental Pet Technologies, Inc.*, 2006 WL 2792337, at *11 (E.D. Ky. 2006) (Although Craig was
unable  to work long hours and lift heavy objects, she was not disabled as a matter of law).

Additionally, Higgins' claim of being unable to stand all day or walk rings hollow in light of his
subsequent employment. After leaving Product Action, Higgins became a full-time security officer
with Georgetown College where he walks three to four miles a day on the grounds and cannot sit
down while on the job [*Id.* at 316; Exh. C (Higgins Dep.) at 28, 57]. He often works overtime in this
position [*Id.* at 63]. His second job is at Soapy Joe's Car Wash where he also does a lot of standing
and walking out to customer cars [*Id.* 68, 70]. Higgins' ability to perform these two physically
demanding jobs belies his claim of needing a sit-down job at Product Action.

Moreover, Higgins presented no direct evidence that his disability was the **sole reason** for
an adverse employment action. Instead, the evidence was that Higgins was terminated for cursing

his supervisor. Higgins admitted doing that, but tried to escape the consequences by saying he was just joking. Even if one were to assume that Higgins met the requirements for a prima facie case, he failed to present any evidence that the legitimate, nondiscriminatory reason for his termination was merely a pretext. Viewing the totality of the evidence in the light most favorable to Higgins, it shows that he was terminated for misconduct and no reasonable jury could conclude otherwise. *See Macy v. Hopkins County Bd. of Educ..* 429 F. Supp. 2d 888, 902 (W.D. Ky. 2006).

With respect to Higgins' claim of disparate treatment, he failed to provide evidence of any similarly situated, nondisabled person who was treated more favorably than he was. His bare argument that a Caucasian inspector, Selena, received lighter duty to accommodate her disability does not support his claim. Since Higgins is not disabled, they are not similarly situated at all. "Comparables" must be "substantially similar in all respects." *Id.* at 899.

F.     **Plaintiffs Jackson and Salam's Claims for Front Pay, Reinstatement or Back Pay are Barred by Their Falsification of Their Applications.**

In addition to their claims lacking merit, Plaintiffs Jackson and Salam are barred from seeking front pay, reinstatement or back pay by their falsification of their applications. Both Jackson and Salam admitted that they falsified their applications by denying their prior criminal convictions. Product Action's policy is prominently located at the bottom of the application form and advises that falsifications may exclude the person from further consideration for employment and may lead to immediate termination of employment after hiring. Had Product Action known of the misrepresentations, it would not have hired Jackson or Salam [Urschel Aff. ¶ 8]. The "after-acquired evidence" doctrine bars obtaining front pay and reinstatement and back pay is limited when the employer learns of prior misconduct through discovery. *Thurman v. Freight Systems, Inc.,* 90 F.3d 1160, 1168 (6th Cir. 1996) (citing *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 362 (1995). Accordingly, Jackson and Salam are also barred from claiming such remedies.

26

**CONCLUSION**

The Court, being otherwise fully and sufficient advised, **HEREBY ORDERS**:

A.      The Motion for Summary Judgment [DE #51] by Product Action International, Inc. is hereby **GRANTED**.  All claims against the Defendant are hereby **DISMISSED WITH PREJUDICE.**

B.      Judgment in favor of Product Action International, Inc. shall be entered contemporaneously with this Opinion and Order.

This _18_ day of December, 2006.


_____
KARL S. FORESTER, SENIOR JUDGE